# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARION UNDERWOOD**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10 C 6359 |
| v. | ) | |
| | ) | Magistrate Judge |
| **MICHAEL J. ASTRUE**, | ) | Martin Ashman |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marion Underwood ("Plaintiff") seeks judicial review of a final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying his

application for Disability Insurance Benefits ("DIB") and Supplemental Security Income benefits

("SSI") under Title II of the Social Security Act.  Before the Court is Plaintiff's motion for

summary judgment.  The parties have consented to have this Court conduct any and all

proceedings in this case, including entry of final judgment.  28 U.S.C. § 636(e);

N.D. Ill. R. 73.1(c).  For the reasons discussed below, Plaintiff's motion is granted in part and

denied in part.

## I.  Legal Standard

In order to qualify for DIB, a claimant must demonstrate that he is disabled.  An

individual is considered to be disabled when he is unable to "engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. *Id*. Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A claim of disability is determined under a five-step analysis. *See* 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. First, the SSA considers whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(4)(I). Second, the SSA examines if the physical or mental impairment is severe, medically determinable, and meets the durational requirement. 20 C.F.R. § 404.1520(4)(ii). Third, the SSA compares the impairment to a list of impairments that are considered conclusively disabling. 20 C.F.R. § 404.1520(4)(iii). If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation proceeds to step four. *Id*. Fourth, the SSA assesses the applicant's ability to engage in past relevant work. 20 C.F.R. § 404.1520(4)(iv). In the final step, the SSA assesses whether the claimant can engage in other work in light of his RFC, age, education and work experience. 20 C.F.R. § 404.1520(4)(v).

Judicial review of the ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court reviews the entire record, but does not displace the ALJ's

- 2 -

judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Thus, even if reasonable minds could differ whether the Plaintiff is disabled, courts will affirm a decision if the ALJ's decision has adequate support. *Elder*, 529 F.3d at 413 (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).


## II.  Procedural History

Plaintiff filed an application for SSI on July 11, 2006 and for DIB on July 28, 2006, alleging that his disability began on January 4, 2005. The Social Security Administration ("SSA") denied his claim initially and upon reconsideration. Plaintiff then sought a hearing before an administrative law judge ("ALJ"), which took place on May 7, 2008. The ALJ denied Plaintiff's claim on November 4, 2008. Plaintiff then timely filed a request for review of the ALJ's decision. The Appeals Council denied review on August 6, 2010, making the ALJ's decision the Commissioner's final decision.


## III.  Factual Background

Plaintiff was a thirty-seven year old high school graduate when he filed for disability benefits. Prior to the onset of his alleged disability, Plaintiff worked for approximately fifteen years as a construction worker and an oil refinery laborer, as well as working in various temporary positions. Plaintiff claims that he was terminated from his last job when his primary care physician, Dr. Sanjay Pethkar, referred him to Provena Saint Joseph Medical Center in

January, 2005. Plaintiff was diagnosed with uncontrolled diabetes mellitus, hypertension, hyperlipidemia, and obesity. (R. 256). He was briefly hospitalized and then released with various medications, including Novolin, an insulin medication to treat his diabetes.

### A.    Dr. Pethkar

The record contains evidence of numerous consultations Plaintiff had with Dr. Pethkar, ranging from February 13, 2006, when Dr. Pethkar diagnosed Plaintiff as suffering from diabetes, gastroenteritis, and hypertension, through October 23, 2007. Throughout that period, Dr. Pethkar noted seriously high blood glucose levels, which were over 230 mg. as of Plaintiff's initial visit. (R. 271). The record also shows that Dr. Pethkar repeatedly noted that Plaintiff failed to comply with the diabetic diet prescribed to him or to take his diabetes and hypertension medications. (R. 276, 282, 286, 287, 289, 291, 295, 298, 300, 304, 306). Dr. Pethkar counseled Plaintiff on numerous occasions on the appropriate diet for diabetes and explained that he would terminate his care if such noncompliance continued. (R. 278, 283, 286, 288, 290, 292, 294, 296, 301, 305, 307).

On June 5, 2006, Plaintiff complained of worsening vision, tingling and numbness of the limbs, and severe pain in the legs. (R. 276). Dr. Pethkar prescribed Clonidine, Coreg, Diovan, and Tarkia for Plaintiff's blood pressure, NovoLog as an insulin for his diabetes, and Lyrica and Vicodin for his pain from diabetic neuropathy. (R. 278). After Plaintiff missed a number of appointments, Dr. Pethkar noted on May 1, 2007 that Plaintiff was suffering from end-organ damage from uncontrolled diabetes and admitted him to Provena Saint Joseph Medical Center. (R. 255, 302). Plaintiff was again diagnosed with diabetes, uncontrolled hyperglycemia,

hypertension, and migraine headaches. (R. 255). He was started on IV fluids and insulin and was discharged with a prescription for Norco, a pain medication. (*Id*.).

Plaintiff's final consultation with Dr. Pethkar took place on October 23, 2007, when Plaintiff complained of tingling and numbness in both of his legs. (R. 306). Dr. Pethkar recommended that Plaintiff have a consultation with an endocrine specialist and a dietician. (R. 307).

### B.      Pain Care America

While he was seeing Dr. Pethkar, Plaintiff also received treatment from Pain Care America. On June 21, 2006, Plaintiff reported constant and severe pain in his feet, as well as fatigue. A physical examination showed bilateral lung wheezing, decreased sensation and numbness in the first through fourth digits of both feet, and minimal bilateral knee and ankle jerk. (R. 215-16). Plaintiff was diagnosed with diabetic peripheral neuropathy and excessive daytime fatigue. (R. 216). He was prescribed Cymbalta in place of Lyrica and continued on the Vicodin earlier prescribed by Dr. Pethkar. In order to help control his various symptoms, Plaintiff was scheduled for a sleep consultation, an orthotics fitting, physical performance measurement consultation, and a physical therapy evaluation. (*Id*.). The latter test revealed moderate weakness in his right knee, and the prescription for Cymbalta was increased. On July 24, 2006, after three physical therapy sessions, Plaintiff reported that he was optimistic and had experienced significant improvement in the pain in his feet. (R. 218).

A second physical performance measurement on August 28, 2006 revealed decreased internal rotation in the left hip, decreased external rotation in right hip, and decreased extension

and flexion in the right knee. (R. 240). Nonetheless, there was significant improvement in the extension and flexion of the right knee from the baseline evaluation. Plaintiff reported that the orthotics were helpful in keeping the pain in his feet stable. (R. 241). He further claimed that both Cymbalta and physical therapy were effective in reducing his pain but that he continued to experience shooting pains in his left lower extremity when the weather changed or when he was under stress. (R. 241).

As part of his treatment plan, Plaintiff also underwent a diagnostic sleep evaluation. Plaintiff had complained that he suffered from chronic fatigue throughout the day, awakened many times in the night, had difficulty returning to sleep, and suffered as well from mood swings. (R. 243). Dr. Wayne Kelly diagnosed Plaintiff with probable severe obstructive sleep apnea, secondary to chronic sleep deprivation and diabetic neuropathic pain. (R. 244). After a follow-up sleep evaluation on September 20, 2006, Dr. Kelly determined that Plaintiff, in fact, demonstrated severe sleep apnea and upper airway resistance syndrome with associated nocturnal hypoxemia. These conditions produced severe chronic sleep deprivation as well as an impairment in Plaintiff's memory and concentration. (R. 245). Dr. Kelly prescribed that Plaintiff use a nasal continuous positive airway pressure ("CPAP") device, as well as Vicodin Extra Strength to help with his neuropathic pain.

After using the CPAP for several days, Plaintiff reported improvements in his sleep apnea syndrome. (R.248). He also reported that the CPAP improved his fatigue and that the physical therapy provided significant relief from pain. (R. 250). However, Plaintiff also stated that he continued to experience some pain in his feet. On January 2, 2007, Dr. Kelly discontinued Cymbalta because Plaintiff's insurance no longer covered it and prescribed a

combination of Vicodin and methadone, which significantly reduced Plaintiff's neuropathic pain. (R. 251).

###    C.    Clinic at University of St. Francis

On January 24, 2008, Plaintiff visited a clinic affiliated with the University of St. Francis, which had a sliding scale fee arrangement.  Plaintiff was diagnosed with questionably controlled diabetes, uncontrolled hypertension, obesity, and diabetic peripheral neuropathy.  He was advised to continue on insulin and was prescribed Clonidine, Coreg, Lisinopril, Amitriptyline, Cymbalta, Norco, and Chantix.  (R. 260-64).

###    D.    State Agency Consultations and Determinations

On October 28, 2006, Dr. Afiz Taiwo conducted a consultative examination of Plaintiff for the SSA.  Plaintiff reported generalized body aches, dry mouth, painful feet, blurry vision, and frequent urination.  He also noted severe pain at a level of nine out of ten and no improvement from physical therapy three times a week.  Dr. Taiwo's examination indicated a non-antalgic gait, a normal range of motion of the hips, knees, and ankles, but a decreased sensation to both feet.  He diagnosed Plaintiff with diabetic peripheral neuropathy, sleep apnea, diabetes, and high blood pressure.  (R. 221-24).

Dr. C. A. Gotway, a state agency reviewing physician, issued a Residual Functional Capacity ("RFC") assessment on November 9, 2006.  Dr. Gotway determined that Plaintiff was able to perform work with a medium level restriction, could lift fifty pounds occasionally and twenty-five pounds frequently, and could stand, walk, and sit for six hours in an eight-hour

workday. (R. 226). On February 9, 2007, Dr. Paul Smalley also reviewed the evidence on file at the reconsideration level, though at the time neither Dr. Pethkar's treatment notes nor records from the St. Francis clinic were available. Dr. Smalley confirmed Dr. Gotway's RFC finding. (R. 252-54).

### E. The Hearing Testimony

On May 7, 2008, Plaintiff and a vocational expert ("VE") testified at a hearing held before the ALJ. Plaintiff described his pain as being primarily in both feet, hands, and in his right shoulder. Although the pain in his feet was constant, it varies in intensity throughout the day and becomes worse as the day wears on. (R. 41-42, 44, 48). Plaintiff stated that he had considerable difficulty in standing and experienced problems in sitting, walking, lifting, and carrying, though he was able to perform most of these activities for two hours out of an eight-hour workday. (R. 30, 43). He also testified that he experienced frequent urination during the night. (R. 30-31).

Although he stated that he continued to take all of the medications prescribed by Dr. Pethkar, Plaintiff testified that he no longer received treatment from either his treating physician or Pain Care America because his insurance had expired. He believed that the medications were helpful in reducing his pain, but they did not completely take the pain away. In addition, Plaintiff stated that the CPAP helps with his daytime drowsiness, but he still becomes very tired at times. (R. 34, 52).

Plaintiff claimed that an ordinary day began at 6:00 a.m. when he wakes to take his medication. He has to lie down again about mid-day because the medicines make him drowsy

- 8 -

and dizzy. (R. 38-39, 52). He lies down throughout the day, though he is able to dress and shower himself. (R. 39). He can prepare very simple meals, but his relatives usually buy groceries for him and perform most of the chores around the house. Plaintiff's primary hobby is fishing, and he does that three to four times during the summer. (R. 40-46). He stated that he could lift twenty to thirty pounds once a day and could lift a gallon of milk for about one-third of an ordinary day. (R. 43, 48). He further testified that he can spend two hours a day walking and standing and could sit for about an hour at a time twice a day.[1] (R. 44).

### F.    The ALJ's Decision

On November 4, 2008, the ALJ issued his decision denying Plaintiff's application for benefits. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of January 4, 2005. He found at step two that Plaintiff had the following severe impairments: obesity, sleep apnea, high blood pressure, and diabetes mellitus with neuropathy. At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. Upon considering the evidence of record, the ALJ found that Plaintiff's statements concerning the intensity, duration, and limiting effects of his condition were not entirely credible. He also found that Plaintiff has the RFC to perform light work with frequent climbing, balancing, stooping, kneeling, and crawling. At step four, the ALJ found Plaintiff capable of performing any past relevant work. Finally, at step five, the ALJ determined that there were jobs

---

[1] The ALJ also heard testimony from the VE. As Plaintiff does not challenge the VE's testimony, the Court does not consider it as part of this order.

that existed in significant numbers in the national economy that Plaintiff could perform.  (R. 11-19).

## IV.   <u>Discussion</u>

Plaintiff argues that the ALJ erred on four grounds.  According to Plaintiff, the ALJ failed to:  (1) state a basis for finding that Plaintiff's impairments did not meet or equal a Listing requirement; (2) properly assess Plaintiff's credibility; (3) correctly determine Plaintiff's RFC; and, (4) include all of Plaintiff's limitations in his questions to the VE.

### A.      **The Listing Issue**

After finding at step two that Plaintiff suffered from the severe impairments of obesity, sleep apnea, high blood pressure, and diabetes mellitus with neuropathy, the ALJ found at step three that Plaintiff did not meet one of the Listings included in Appendix 1 of the regulations. Plaintiff argues that the ALJ erred by failing to identify any specific Listing in his decision and by not properly discussing the evidence that would have been relevant in reaching a decision at step three.  According to Plaintiff, the potentially relevant Listings that should have been identified and discussed are §  9.08(A) (diabetes), § 3.00H (sleep-related breathing disorders), § 3.00I (effects of obesity), and § 3.10 (sleep apnea).  In considering whether a claimant's condition meets or equals a Listing, an ALJ must cite the specific Listing in question and offer more than a perfunctory analysis.  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).  The ALJ's discussion must be sufficient for a meaningful judicial review to be possible, and the failure to state what Listing is under consideration, combined with a *de minimis* discussion, can

be grounds for reversal.  *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003);

*Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

The ALJ failed to meet the first part of this standard by not identifying any specific

Listing at step three.  As for the second part, the ALJ provided only of the following boilerplate

statement as part of his step three decision:  "The claimant does not have an impairment or

combination of impairments that meets or medically equals one of the listed impairments in

20 CFR 404, Subpart P, Appendix 1, Regulations No 4."  (R. 15).  In itself, this bare statement is

insufficient to meet the ALJ's discussion burden at step three, as it provides no guidance on what

the ALJ considered in reaching his decision or the basis for his reasoning.  The Commissioner

argues that, notwithstanding this omission, Plaintiff's argument still fails because he does not

even contend that he meets a Listing.[2]  That is not the essence of Plaintiff's argument, however.

Instead, he claims that the ALJ erred in not discussing the evidence related to the Listings, failed

to build a logical bridge between the evidence cited in the decision and the step three decision,

and failed to consider if Plaintiff's conditions equaled, not just met, a listed impairment.  An

---

[2]  The Commissioner also argues that the ALJ did not err because Plaintiff's counsel conceded at the hearing that Plaintiff did not meet a Listing.  Counsel stated in relation to Listing 9.08, "I can't say that from the way the listing is worded that, that he meets a listing."  (R. 25).  Even if this constituted a waiver of the diabetic neuropathy Listing, the ALJ was still required to state his reasons for the step three decision so that a Court could conduct a meaningful review.  The ALJ's consideration of this issue is somewhat clearer than for the other Listings cited by Plaintiff.  Listing 9.08A concerns neuoropathy "demonstrated by significant and persistent disorganization of motor functioning in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 9.08A.  Here, the ALJ did note that Dr. Taiwo stated that Plaintiff's gait was "non-antalgic [non-limping] without the use of assistive devices."  (R. 223).  The ALJ also took general, if exceptionally brief, notice of Dr. Taiwo's report, which included the additional finding that Plaintiff could walk more than fifty feet without support.  (*Id*.).  The Court finds this sufficient – although just barely – to satisfy the ALJ's discussion burden at step three on Listing 9.08A.

ALJ's step three decision is reversible when he fails to meet the second of these requirements such that a reviewing court cannot trace out his reasoning. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). When a claimant's condition does not meet each of the requirements for a Listing, moreover, it can still equal a listed impairment when "it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a).

The Court agrees that the ALJ failed to meet these standards. As noted, Plaintiff points to Listing 3.00I, which requires an ALJ to consider the combined effects of a claimant's obesity with his other respiratory problems. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00I. The ALJ found that obesity was a severe impairment at step two and, as discussed below, he concluded – albeit without explanation – that it also affected Plaintiff's RFC. Despite this obvious concern with obesity, however, the ALJ's decision provides no discussion concerning the effects of obesity on Plaintiff's sleep apnea, which Listing 3.00H defines as part of a sleep-related breathing disorder. Listing 3.00I states that the combined effects of obesity and a breathing disturbance can be greater than either condition alone, and it requires an ALJ to consider a claimant's obesity at each step of the evaluative process, including step three. *See id.* ("[W]hen determining whether an individual with obesity has a listing-level impairment or combination of impairments . . . adjudicators *must* consider any additional cumulative effects of obesity.") (emphasis added). The ALJ's decision contains no discussion of this condition other than the severity finding at step two and the unexplained comment that obesity affected Plaintiff's RFC. As a result, the Court cannot follow the ALJ's reasoning or even determine if he considered this issue at step three.

Listing 3.10 (sleep apnea) is equally opaque in the ALJ's decision and is especially problematic because of its complex nature. It provides that sleep-related breathing disorders should be evaluated by reference to one of two other Listings: Listing 12.20 (organic mental disorders) or Listing 3.09, which addresses cor pulmonale secondary to chronic pulmonary vascular hypertension.[3] Listing 3.09 states: "Clinical evidence of cor pulmonale (documented according to 3.00G)[4] with: (A) mean pulmonary artery pressure greater than 40 mm Hg; or (B) arterial hypoxemia [blood oxygen pressure]. Evaluate under the criteria in 3.02C2." Section 3.02C2, in turn, addresses chronic impairments of gas exchange related to pulmonary disease and sets out an elaborate set of requirements for testing and evaluating the results of such tests.

The Court cannot determine from the ALJ's decision what consideration he gave to any part of Listing 3.10. The ALJ's decision does not mention the presence or absence of organic brain disorders, cor pulmonale, or pulmonary arterial pressure, though the record does not indicate that the first two conditions were present here. He does refer to a sleep test showing that Plaintiff suffered from "severe nocturnal hypoxena [sic] to a low of 77%." (R. 14). It is entirely unclear, however, how this relates to the criteria cited in Listing 3.02C2 for arterial blood gas values, and the Court cannot follow the ALJ's reasoning from the bare citation of the 77% hypoxemia level to his finding that Plaintiff did not meet a listed impairment. Moreover, the

---

[3] A cor pulmonale is "a right ventricular enlargement secondary to a lung disorder that produces pulmonary artery hypertension." The Merck Manual 664 (18th ed. 2006).

[4] Section 3.00G concerns cor pulmonale and pulmonary vascular disease and contains complex standards for establishing impairments attributable to cor pulmonale secondary to chronic pulmonary hypertension. The ALJ did not discuss the arterial pressure component the Listings Plaintiff cites, but Plaintiff points to no evidence in the record that is relevant to this issue.

ALJ gives no indication that he considered the standards set forth in Listing 3.02C2, including the complex data contained in Table III-A of that section.

The Commissioner argues that any error related to this Listing is harmless because Listing 3.02C2 requires two separate sleep tests, and the record only indicates that Plaintiff had one such test. Again, however, Plaintiff also argues that the ALJ was required to consider whether he equaled the impairment defined by Listing 3.02C2 even if he did not meet its stated standard. An equivalence decision at step three is a medical judgment in which an ALJ "must consider an expert's opinion on the issue." *Barnett*, 381 F.3d at 668. Social Security Ruling 86-8 states:

> Any decision as to whether an individual's impairment or impairments are medically the equivalent of a listed impairment must be based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques, including consideration of a medical judgment about medical equivalence furnished by one or more physicians designated by the Secretary.

SSR 86-8. The ALJ did not do so in this case. Dr. Taiwo, who examined Plaintiff for the state agency on October 28, 2006, noted that Plaintiff had sleep apnea, but he did not show any familiarity with the results of the September 20, 2006 sleep-study results. The ALJ referred in broad terms to Dr. Taiwo's report but did not take notice of whether or not Dr. Taiwo had even diagnosed Plaintiff with sleep apnea. State agency physician Dr. Gotway provided a report dated November 9, 2006 concerning Plaintiff's RFC, but he did not address any issue related to Plaintiff's sleep apnea. Thus, the Court cannot find that the ALJ considered medical evidence related to the equivalence standard of step three or that he gave consideration to whether Plaintiff's condition equaled the criteria for this Listing.

For these reasons, the Court finds that the ALJ failed to meet his obligation to provide an adequate discussion of the Listings at issue in step three, and Plaintiff's motion is granted on this issue.

**B.      The Credibility Issue**

Plaintiff also argues that the ALJ erred by finding that his statements concerning the intensity, duration, and limiting effects of his symptoms were not entirely credible. The Court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678.  An ALJ's credibility determination warrants reversal only if it is so lacking in explanation or support that it is "patently wrong." *Elder*, 529 F.3d at 413-14.  An ALJ should consider the entire case record and give specific reasons for the weight given to an individual's statements.  SSR 96-7p.  Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received, medication taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* SSR 96-7p (setting out the seven factors an ALJ should consider as part of a credibility analysis).

In this case, the ALJ's decision presents a mixed picture but not one that is so incorrect that the Court could find that its consideration of the seven factors outlined in SSR 96-7p is, in itself, patently wrong.  For example, the ALJ misconstrued certain portions of Plaintiff's testimony.  Plaintiff stated at the hearing that he could lift a gallon of milk about one-third of a day; the ALJ mistakenly concluded that Plaintiff claimed that he could do so for three-quarters of a day – a threefold increase that could suggest significantly greater endurance than Plaintiff

actually claimed to have. (R. 16, 48). Balanced against this is the ALJ's careful consideration of various other factors that support his finding, such as Plaintiff's claim that he could lift twenty to thirty pounds and use a ten-pound dumbell for exercise. (*Id*.). Plaintiff takes exception with the ALJ's finding that Plaintiff testified that his medication reduces his pain "but does not limit him." (R. 16). As Plaintiff points out, he testified at some length concerning the side effects of his medication. In other portions of his decision, however, the ALJ noted these side effects and laid out in some detail Plaintiff's need to lie down after taking them because "his medications cause him to be drowsy and lose appetite." (R. 16).

If the ALJ's credibility determination were based primarily on the seven factors cited in SSR 96-7p, the Court would be reluctant to find that it constitutes reversible error. However, the only specific reason for the credibility decision mentioned by the ALJ is that Plaintiff showed a history of noncompliance with his diabetes treatment. (R. 16). As noted earlier, Dr. Pethkar's treatment notes indicate a prolonged pattern of noncompliance with both the diet and the medication prescribed to help control Plaintiff's diabetes. Indeed, Plaintiff's failure to comply with these recommendations was so serious that Dr. Pethkar repeatedly warned Plaintiff that he would no longer provide treatment if it continued. (R. 278, 282, 286, 288, 292, 294, 296, 301, 305, 307). As the Commissioner correctly notes, SSR 96-7p states that a history of noncompliance with recommended treatments can suggest that a claimant's allegations of pain are not entirely credible.

However, SSR 96-7p also clearly provides that and ALJ "*must not* draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular treatment without first considering any explanations that the individual may provide . . ."

SSR 96-7p (emphasis added). Courts in this Circuit have repeatedly found that an ALJ may not reach an adverse credibility determination based on a failure to seek treatment or to comply with medication regimes without first seeking an explanation from the claimant for his behavior. *See Brindisi*, 315 F.3d at 787; *Craft*, 539 F.3d at 679; *Ellis v. Barnhart*, 384 F. Supp.2d 1195, 1203 (N.D. Ill. 2005) ("[T]he ALJ could rely on [claimant's] non-compliance as long as he had first considered [her] explanations for her non-compliance."); *Dominguese v. Massanri*, 172 F. Supp.2d 1087, 1097 (E.D. Wis. 2001) (stating that SSR 96-7p "requires an ALJ to ask a claimant for an explanation or to search the record for an explanation before drawing an adverse inference as to the severity of the claimant's condition based on medical visits."); *Peevy v. Astrue*, No. 1:08-CV-111, 2009 WL 2169797, at *2 (N.D. Ind. July 20, 2009).

The ALJ in this case made no inquiry into Plaintiff's noncompliance with Dr. Pethkar's treatment, and the Commissioner provides no argument on why the ALJ's failure to do so accords with the well-established guidelines that govern credibility determinations. The Court agrees with the Commissioner that, had the ALJ done so, Plaintiff's failure to follow the diet and medication regime recommended by Dr. Pethkar could reasonably have led the ALJ to find that Plaintiff's allegations of pain were not entirely credible. But the ALJ ignored his clear duty to inquire into Plaintiff's noncompliance despite its obvious relevance to the credibility issue. Accordingly, the Court finds that substantial evidence does not support the ALJ's finding, and Plaintiff's motion is granted on this issue.

### C.     The RFC Issue

As noted above, state agency physician Dr. Gotway found that Plaintiff had the RFC to perform work with a medium-level restriction, could lift fifty pounds occasionally and twenty-five pounds frequently, and could stand, walk, and sit for six hours in an eight-hour work day. (R. 226, 252-54). The ALJ, however, found that Plaintiff's obesity limited him to light work, with frequent climbing, balancing, stooping, kneeling, crouching, and crawling. (R. 15-16). Light work involves lifting only twenty pounds at a time, and ten pounds frequently. 20 C.F.R. § 404.1567(b). "Frequently" in this context means one-third to two-thirds of the time. SSR 83-10. Light work also involves "a good deal" of walking. 20 C.F.R. § 404.1567(b).

Plaintiff argues that no medical evidence supports the ALJ's RFC conclusion and that in basing his finding on obesity, the ALJ also improperly made his own medical determination. The Court agrees that the ALJ failed to cite any medical evidence supporting his finding and failed to build a logical bridge between the evidence in the record and his RFC determination. An RFC finding is a legal, not a medical, conclusion and is reserved to the Commissioner. 20 C.F.R. § 404.1527(e). Nevertheless, an ALJ must consider the entire record, including all relevant medical and nonmedical evidence. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Here, the ALJ clearly disagreed with the state agency physician, who determined that Plaintiff could perform work at a medium level. In using Plaintiff's obesity as a ground for doing so, however, the ALJ failed to cite any evidence, medical or nonmedical, supporting his conclusion that obesity limited Plaintiff's work activities. As discussed above, the decision notes only that Plaintiff's weight (260 pounds) constitutes a severe impairment, but it does not provide any discussion or evidence related to the exertional or non-exertional limitations that stem from Plaintiff's weight.

When an ALJ rejects a state agency RFC determination and arrives at his own RFC finding without citing medical evidence, he makes an independent medical conclusion that is both prohibited in itself and is unsupported by substantial evidence. *See Bailey v. Barnhart*, 473 F. Supp.2d 842, 849-50 (N.D. Ill. 2006) (reversing when, as here, an ALJ rejects a state agency physician's medium-level RFC and substitutes his own RFC finding of light work). The Commissioner points to no medical evidence concerning the limiting effects Plaintiff's obesity had on his ability to work, and the ALJ's opinion itself does not cite any part of the record on this issue. Moreover, Plaintiff did not testify that he was restricted by his obesity, limiting his statements instead to neuropathy-related restrictions. As a result, the ALJ's decision is not supported by substantial evidence, nor does it build a logical bridge between the evidence relied on and the RFC conclusion.

The Court also agrees with Plaintiff that the ALJ failed to explain how Plaintiff would be able to sustain work activities for an eight hour period. Social Security Ruling 96-8p contains a section titled "Narrative Discussion Requirement" that lays out topics on which an ALJ must provide some discussion and "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p. These include "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)" as well as a description of how the evidence supports each of an ALJ's RFC conclusions. SSR 96-8p. As SSR 96-8p's language makes clear, such narrative discussions are mandatory, not discretionary, requirements.

Here, the ALJ duly noted that Plaintiff's daytime fatigue improved after using a CPAP device for his sleep apnea. (R. 14). But he failed to provide any discussion of how Plaintiff would be able to sustain his work activities in light of the fatigue and drowsiness caused by his medications, symptoms that are independent of Plaintiff's sleep-related fatigue. Plaintiff testified that he needed to lie down after taking the medication and that he slept or rested for periods of time during the day as a result. Plaintiff also testified that he could only walk for two hours out of an eight-hour work day. By concluding that Plaintiff's testimony was not entirely credible, the ALJ did not find that Plaintiff's RFC was limited by the non-exertional limitations that could have been imposed by his fatigue. That credibility finding was flawed, however, and Plaintiff's testimony directly contradicts the ALJ's RFC of light work. Thus, an ambiguity exists between Plaintiff's statements and the requirements of light work that the ALJ failed to address. *See* SSR 96-89 (requiring an ALJ to "include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence" and to resolve inconsistencies and ambiguities in the record). Accordingly Plaintiff's motion is granted on this point.

### D.      The ALJ's Hypothetical Question

Finally, Plaintiff argues that the ALJ failed to include the effects of his medication-related drowsiness to the VE as part of the hypothetical questions posed to the VE at the hearing. The Commissioner responds that the ALJ was not required to include Plaintiff's fatigue in his questions because his medication-related fatigue was based on Plaintiff's own testimony, and the ALJ determined that Plaintiff's statements were not entirely credible. The Court disagrees with

both these arguments because the parties overlook that the ALJ did, in fact, pose Plaintiff's alleged drowsiness to the VE. His final hypothetical question asked, "Now also assume I find claimant totally credible and all his impairments supported by the medical evidence. Would there be any jobs in your opinion." (R. 64). This implicitly included Plaintiff's subjective allegations concerning his need to lie down, which the VE heard as part of the hearing testimony and with which he was clearly familiar.[5] The VE answered, "No, your Honor." (*Id.*). Thus, the ALJ did include Plaintiff's subjective statements concerning his non-exertional limitation in his hypothetical to the ALJ, and Plaintiff's motion is denied on this issue.

## V. <u>Conclusion</u>

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 19] is granted in part and denied in part. Accordingly, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

**ENTER ORDER:**

_Martin C. Cullman_
**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:** September 22, 2011.

---

[5] The VE stated that his response stemmed from Plaintiff's "condition of the pain requiring to lay down . . . frequently throughout the day." (*Id.*). This response can only refer to Plaintiff's testimony that he had to lie down because of the effects of medication he took *for* the pain, not the pain itself. Although Plaintiff stated that he could only sit for a two-hour period, the large majority of his testimony on this issue concerned the need to rest because of medication-related drowsiness. Even if the VE based on testimony on pain itself, the result would be the same: Plaintiff's need to rest would preclude him from working in any available job.